c

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## ALEXANDRIA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** Plaintiff | **CRIMINAL NO. 1:21-CR-00155-03** |
| **VERSUS** | **JUDGE DRELL** |
| **ADAM JAMES JOHNSON,** Defendant | **MAGISTRATE JUDGE PEREZ-MONTES** |

## REPORT AND RECOMMENDATION

Before the Court are Motions to Suppress (ECF Nos. 131, 214) filed by Defendant Adam James Johnson ("Johnson"). Johnson seeks suppression of any statements made after his arrest and all evidence seized under two search warrants involving the searches of his residence on March 4, 2020. ECF No. 131-1 at 3. Johnson, through later retained counsel, supplemented his previous motion, seeking suppression of all evidence seized resulting from an unlawfully conducted traffic stop, evidence seized as a result of the first and second warrants, and evidence gathered as a result of the warrant to search Johnson's cell phone and Facebook account because the cell phone was seized as a result of an unlawful traffic stop. ECF No. 214.

The United States of America (the "Government") opposes. ECF Nos. 133, 242.

Because the traffic stop was lawful at its inception and was supported by probable cause that Johnson committed a traffic violation; because the executing officers acted in objectively good faith in relying upon the warrants; and because

Johnson lacks standing to challenge Dowden's statements, Johnson's Motions to Suppress (ECF Nos. 131, 214) should be DENIED.

## I.    Background

Johnson is one of six co-defendants in a nine-count drug trafficking indictment. ECF No. 1.    Johnson is charged with one count of conspiracy to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count 1); one count of felon in possession of a firearm in violation of 18 U.S.C. § 922(g) (Count 2); and one count of possession with intent to distribute methamphetamine in violation of 18 U.S.C. § 841(a)(1) (Count 3).  ECF No. 1.

Through court-appointed counsel, Johnson filed his first Motion to Suppress (ECF No. 131) seeking suppression of evidence seized following a traffic stop, and from the execution of two search warrants of his residence on the same day.  ECF No. 131 at 1.  Thompson argues that:  (1) the search warrants are unsigned as they have electronic signatures; (2) the warrant issued at 12:25:02 a.m. on March 4, 2020 (the "first warrant") was based on hearsay of a confidential informant ("CI") whose reliability was not established; and (3) the warrant issued at 4:10:43 a.m. on March 4, 2020 (the "second warrant") was flawed because it was based on the first warrant and does not indicate the premises was secure.  ECF No. 131 at 3.

The Government opposed the first motion.  ECF No. 133.  The Government argued that:  (1) the state search warrants executed were indeed signed; (2) the first warrant contained information indicating the reliability of the CI; (that Johnson's

arrest for driving under suspension is valid; and that it is irrelevant that the second warrant does not explicitly state the premises was secure.  ECF No. 133 at 4-7.

The first motion was heard before the undersigned on March 2, 2022.  ECF No. 153.  The Government produced the testimony of Captain Jesse Taitano ("Captain Taitano") of the Natchitoches Parish Sheriff's Office ("NPSO").  At the hearing, Johnson fired his court-appointed lawyer.  ECF Nos. 153, 161.  Through later retained counsel, and after review of the transcript of the first hearing, Johnson filed a second (supplemental) Motion to Suppress.  ECF No. 214.

Johnson seeks to revisit the first motion (ECF No. 131), and to supplement his request for suppression of all evidence against him on the grounds that the initial traffic stop, which led to his arrest, was without probable cause.  ECF No. 214 at 4. Johnson further asserts that the first search warrant lacked probable cause, that law enforcement used coercion to obtain co-defendant Ashley Dowden's ("Dowden's") statements as well as evidence unlawfully obtained using the first warrant to obtain the second warrant, and that the cell phone was seized because of an unlawful stop and unlawful warrants.  ECF No. 214 at 4-5.

The Government opposes.  ECF No. 242.  The Government seeks denial based on the fact that Johnson's traffic stop was supported by probable cause, that the first search warrant contained probable cause including information from a reliable CI, that Johnson lacks standing to challenge the validity of Dowden's interviews, and that the second search warrant contained probable cause.  ECF No. 242 at 4-10.

A second evidentiary hearing was held before the undersigned on October 25, 2022.  ECF No. 261.  The Government produced the testimony of Lieutenant ("Lt.") Matthew Powell ("Lt. Powell"), Trooper Charles Dranguet ("Trooper Dranguet"), Lt. Brandon Smith ("Lt. Smith"), and Lt. Jonathan Roberts ("Lt. Roberts").  ECF Nos. 261, 262.  The Government also introduced the following exhibits:  (1) Johnson's March 16, 2021 NCIC; (2) the NPSO CAD Report dated January 4, 2020; (3) the January 5, 2020 affidavit of arrest on Johnson; (4) the January 4, 2020 search warrant for 403 Jefferson street; (5) photos from the search warrant; (6) a flash drive of Johnson's traffic stop dated March 3, 2020; (7) Dowden's Miranda Warning Waiver dated March 4, 2020; (8) a flash drive of Dowden's first interview; (9) Dowden's second Miranda Warning Waiver; (10) a flash drive of Dowden's second interview; (11) the NPSO CAD Report dated March 4, 2020; (12) the NPSO arrest report dated March 4, 2020; Johnson's Miranda Warning; and (13) photos of 403 Jefferson Street.  ECF No. 263.

The evidence established the following facts:

On January 4, 2020, Johnson was pulled over for a traffic stop in a red 2015 Nissan and found to be in possession of half an ounce of suspected methamphetamine. Agents obtained and conducted a search warrant at Johnson's address of 403-B Jefferson Street.  Johnson was arrested and charged with possession of Schedule II, possession of drug paraphernalia, and operating a vehicle while under suspension. Agents seized drug paraphernalia and a suspected drug ledger.  Johnson advised at

the time there would possibly be a female at the residence by the name of Ashley Dowden. She was not present at the time of the search.

In early March 2020, a CI (hereafter referred to as "CI-1") – who was not a paid informant – provided information to the NPSO about narcotic trafficking in the area. The CI-1 was deemed reliable due to providing information in the past that led to arrests related to burglaries and narcotics.

The CI-1 provided information that there were narcotics at the residence where Johnson and his girlfriend Dowden lived. Agents met with the CI-1 who identified Johnson in a photo lineup and provided a cell phone number for Johnson. CI-1 also provided information that Johnson drives a "jacked up" red Nissan pickup truck and gave his address. Agents were able to corroborate where Johnson lived – 403-B Jefferson Street – based on his prior January 2020 arrest.

Another subject, Eric Sandifer ("Sandifer"), was arrested by the Rapides Parish Sheriff's Office ("RPSO"). Lieutenant Beebe of RPSO contacted Captain Taitano and stated that Sandifer was cooperating. Sandifer gave him access to his cell phone, his Facebook, and different social media. In that, information provided that there were drug transactions between Johnson and Sandifer. Both CI-1 and Sandifer provided information regarding the potential presence of six kilograms ("kilos") of methamphetamine in Johnson's possession. CI-1 and Sandifer were unknown to each other.

Agents attempted a controlled buy of two kilos of suspected methamphetamine with Sandifer making a phone call to Johnson. Johnson said, "I heard you got arrested by Probation & Parole," and hung up.

While surveilling Johnson on March 3, 2020, agents observed Johnson leave the residence in Dowden's gray sedan and observed Dowden leave in Johnson's red Nissan pickup truck. Johnson headed north on Jefferson Street. Agents were aware that Johnson was operating a motor vehicle with a suspended driver's license. Captain Taitano, the lead investigator, made the decision over the phone to stop Johnson for operating a motor vehicle with a suspended driver's license. Trooper Dranguet initiated the stop after confirming with dispatch that Johnson's license was still suspended. Johnson was arrested for driving under suspension, verbally Mirandized, and detained based on the ongoing narcotics investigation.

The K-9 unit came out and actively alerted on the vehicle indicating that there was once or could have been illegal narcotics in the vehicle Johnson was driving. No illegal narcotics were found in that vehicle. Other units also stopped Dowden who was driving Johnson's red Nissan Titan on probable cause of improper lane usage on I-49. At that time, a K-9 search was conducted and showed a positive alert on the vehicle. Dowden also provided written consent to search the vehicle. As a result of the search, officers located a firearm that was stolen out of the Natchitoches City Police Department, some drug paraphernalia, and a small amount of marijuana. No large quantity of narcotics was in that vehicle either.

At around 12:25 a.m. on March 4, 2020, agents applied for and obtained the first search warrant for the residence at 403-B Jefferson Street, which was still being surveilled.  The warrant was executed electronically by Judge Lala Sylvester ("Judge Sylvester") of the Tenth Judicial District Court.  Agents went to the residence and knocked.  After no one approached the door, they executed a forced entry.  No one was inside the residence.  Agents collected methamphetamine, packaging devices, plastic bag sealers, marijuana, a white container with suspected methamphetamine residue, orange and white bottles used to smoke illegal narcotics, functioning scales, digital scales, a box of 9-millimeter ammunition consistent with the caliber of the stolen gun, 9.8 grams of methamphetamine, three counterfeit $100 bills, glass pipes, a Food Saver vacuum machine, and other paraphernalia. Agents concluded the search at around 2:00 in the morning.

Johnson was taken to the Natchitoches Parish Detention Center and charged with possession of CDS II methamphetamine, which was found at his residence, drug paraphernalia, the traffic violation of driving under suspension, and possession of the stolen firearm found in his vehicle.  Agents advised Dowden she would also be charged with the stolen handgun because she was operating the motor vehicle at the time and for the items found at the residence because she was staying there. Dowden's address is listed as 380 Eight Mile Loop.  But she informed agents that she was in a relationship with Johnson and stayed at the Jefferson Street residence.

Dowden initially did not want to speak to agents, but later after being re-read and waiving her *Miranda* rights, elected to speak to agents.  Dowden informed agents

that they missed a large amount of methamphetamine at the residence that agents had just searched.  She stated that she had placed it in Johnson's attic under some boards and insulation under his direction.  She stated she had put them there a few days prior after they had just returned from Dallas.

With this information, at around 2:30 or 3:30 in the morning, agents applied for and obtained the second search warrant of 403-B Jefferson Street.  Again, Judge Sylvester electronically signed the warrant.  Dowden agreed to go with agents and show them exactly where she had placed the large amount of methamphetamine in the residence.  Dowden led agents to the master bedroom in the apartment and pointed up to the ceiling in the corner.  Agents went back up into the attic to the exact place and located two bags – a black and grey Craftsman tool bag and an orange and white tote bag.  Agents located nine individual vacuum-sealed bags containing suspected methamphetamine in the orange and white tote bag, and eight vacuum-sealed bags containing suspected methamphetamine in the black and grey Craftsman tool bag. Agents recovered a total of approximately 8.75 pounds of methamphetamine.

Agents used the computer program "WarrantNow" to apply for the search warrants.  Those are sent digitally to the district judge, where she reviews them and digitally signs them.  Once signed, agents print them off and then do a return after they conclude their search.  Both warrants on 403-B Jefferson Street in Natchitoches were electronically signed by state Judge Lala Sylvester.  Captain Taitano spoke with Judge Sylvester before he submitted the digital application for a warrant.

## II.   Law and Analysis

### A.   Standards governing the Motion to Suppress.

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and requires that search warrants issue only "upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. Amend. IV.  As the proponent of a motion to suppress, Johnson has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of his Fourth Amendment rights.  *United States v. Iraheta*, 764 F.3d 455, 460 (5th Cir. 2019).

"When government officials conduct a search in violation of the Fourth Amendment, prosecutors are barred from introducing evidence obtained in the unlawful search at trial."  *United States v. Aguilar*, 973 F.3d 445, 449 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 1102 (2021).  This judicially-created remedy—designed to "safeguard Fourth Amendment rights generally through its deterrent effect"—is known as the exclusionary rule.  *United States v. Beverly*, 943 F.3d 225, 232 (5th Cir. 2019), *cert. denied*, 140 S. Ct. 2550 (2020) (cleaned up).

In *United States v. Leon*, the Supreme Court established an exception to the exclusionary rule:  the "good-faith exception."  468 U.S. 897, 919–922 (1984).  The exclusionary rule should not apply where the officer's reliance on the warrant was objectively reasonable and in "good faith"—even if the search warrant is later

invalidated for lack of probable cause. *Id.*; *United States v. Payne*, 341 F.3d 393, 399 (5th Cir. 2003). Relying on *Leon*, the Fifth Circuit has held that "if law enforcement officials act in objectively reasonable good-faith reliance upon a search warrant, then evidence obtained pursuant to the warrant is admissible even if the affidavit on which the warrant was grounded was insufficient to establish probable cause." *United States v. Juarez*, 407 Fed.Appx. 824, 825 (5th Cir. 2011). The defendant bears the initial burden of showing the good faith exception does not apply. *United States v. Jarman*, 847 F.3d 259, 264 (5th Cir. 2017).

**B.    For an investigative traffic stop to be lawful, it must be justified at its inception.**

"Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." *Wren v. United States*, 517 U.S. 806, 809-10 (1996). "An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances . . . [T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Id.* at 810.

"The reasonableness of traffic stops and investigative detentions of motorists who are suspected of criminal activity is analyzed under the framework established in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed. 889 (1968)." *United States v. Rosales-Giron*, 592 Fed.Appx 246, 250 (5th Cir. 2014) (quoting *United States v. Stevens*, 487 F.3d 232, 244 (5th Cir. 2007)). "Under *Terry*, [courts] determine the reasonableness of an investigative stop by examining: (1) whether the officer's action

of stopping the vehicle was justified at its inception, and (2) whether the officer's actions were reasonably related in scope to the circumstances that justified the stop." *Id.*

Here, Johnson is only contesting whether the stop of his vehicle was justified at inception, the first prong of *Terry*. For a traffic stop to be justified at its inception, an officer need only have reasonable suspicion that "some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle". *United States v. Lopez–Moreno,* 420 F.3d 420, 430 (5th Cir. 2005) (citing *Breeland,* 53 F.3d at 102). The "reasonable suspicion" analysis requires assessing the totality of the circumstances. *United States v. Powell,* 732 F.3d 361, 369 (5th Cir. 2013) (citation omitted). "[R]easonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure." *Lopez-Moreno*, 420 F.3d at 430.

"Probable cause exists when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed, or was in the process of committing, an offense." *United States v. Zavala*, 541 F.3d 562, 575 (5th Cir. 2008) (quoting *United States v. Castro*, 166 F.3d. 728, 733 (5th Cir. 2007) (en banc)). Therefore, probable cause to make a traffic stop exists, *inter alia*, when a defendant commits a traffic violation, and a law enforcement officer observes the violation. *E.g., United States v. Khanalizadeh*, 493 F.3d 479, 482 (5th Cir. 2007) (per curiam).

As is well known, "[t]he rule established by the Supreme Court in *Whren* allows officers to justify a stop by the occurrence of a traffic violation even though this is not the real reason for the stop." *United States v. Cole*, 444 F.3d 688, 689 (5th Cir. 2006). But, the legal justification for the traffic stop must be "objectively grounded." *Id.* "[S]o long as a traffic law infraction that would have *objectively* justified the stop had taken place, the fact that the police officer may have made the stop for a reason other than the occurrence of the traffic infraction is irrelevant for purposes of the Fourth Amendment." *Goodwin v. Johnson*, 132 F.3d 162, 173 (5th Cir. 1998) (emphasis added) (citing *Whren*, 517 U.S. 806).

### C.    The stopping of Johnson's vehicle was justified at its inception.

Johnson argues that he was arrested for driving under suspicion and for being the subject of an ongoing narcotics investigation. ECF No 131-1 at 3. He asserts that driving without a valid license under La. R.S. 32:57 is a general prohibition and that he was not subject to arrest for the offense. *Id.* He further asserts that being a suspect under investigation is not grounds for arrest. *Id.*

Johnson contends that there was no indication that any traffic infraction was observed by law enforcement prior to conducting the stop. ECF No. 214-1 at 2. Johnson asserts that the police initiated the traffic stop based on previous knowledge that Johnson's license was suspended. *Id.* at 3. Johnson argues that Captain Taitano's testimony at the first hearing regarding probable cause for the traffic stop was that "we knew we had that information already." *Id.* Johnson claims no effort was made by police to determine if Johnson's license was still suspended at the time

12

of the stop. *Id.* Johnson argues there was no probable cause to initiate the stop and the ensuing search was unlawful. *Id.* Thus, Johnson seeks suppression of all evidence seized as a result including, but not limited to the cell phone, the alleged drug indication by the K-9, and all calls made at the jail by Johnson. *Id.*

Here, the stop of Johnson's vehicle was based on reasonable suspicion that Johnson was driving under suspension. The evidence shows that on March 3, 2020, Johnson was stopped by Trooper Dranguet for operating a motor vehicle with a suspended driver's license in violation of La. R.S. 32:415.[1] Trooper Dranguet testified that while assisting in surveillance, he was told by Captain Taitano to follow Johnson after he left 403-B Jefferson Street in a silver sedan and initiate a traffic stop for driving under suspension if he needed to. Trooper Dranguet observed Johnson pass in front of him, pulled behind him, and began following him. Trooper Dranguet traveled behind Johnson for a period of time and was eventually given the go ahead by Captain Taitano to initiate the traffic stop. Trooper Dranguet further testified that he had previously received Johnson's driver's license number through the surveillance team group text message and was aware that Johnson had a suspended license.[2] Trooper Dranguet testified he also confirmed Johnson's license suspension

---

[1] "It shall be unlawful for any person to operate a motor vehicle upon any public highway of this state during the period of suspension, revocation or cancellation of any license which may have been issued to him by this state or by any other state." La. R.S. 32:415A.

[2] Under the collective knowledge doctrine, an officer initiating a stop or conducting a search need not have personal knowledge of the evidence that gave rise to the reasonable suspicion, so long as he is acting at the request of those who have the necessary information. *United States v. McPherson*, 630 Fed.Appx. 330, 331 (5th Cir. 2016) (citing *United States v. Ibarra–Sanchez*, 199 F.3d 753, 759 (5th Cir. 1999)). The collective knowledge theory applies so long

by phone with dispatch prior to initiating the stop, as was verified in the NPSO CAD report. Trooper Dranguet initiated his lights and pulled Johnson over. When Johnson stepped out, Trooper Dranguet introduced himself, placed Johnson in handcuffs for driving under suspension, and verbally Mirandized him.

Here, the evidence shows that Trooper Dranguet conducted a legal stop, under *Terry*, after witnessing Johnson driving under suspension in violation of La. R.S. 32:415A. Thus, officers had reasonable suspicion to stop Johnson's vehicle and the stop was justified at its inception. Once Trooper Dranguet saw Johnson operating his vehicle under a suspended driver's license, and after he observed the traffic violation, probable cause existed to stop Johnson's car. *See Lopez-Moreno*, 420 F.3d. at 430. At the point of the traffic stop for operating a vehicle under a suspended license, Trooper Dranguet had authority to arrest Johnson. *See United States v. Henry*, 37 F.4th 173, 176 (5th Cir. 2022). Here, the first prong of *Terry* has been met.

Moreover, Trooper Dranguet was aware that Johnson was under a narcotics investigation in addition to driving under a suspended license. Under *Wren*, a traffic stop, even if pretextual, does not violate the Fourth Amendment if the officer making the stop has "probable cause to believe that a traffic violation has occurred." 517 U.S. at 810; *see also Cole*, 444 F.3d at 689. The subjective motivations of police in a traffic stop are deemed irrelevant as long as their conduct does not exceed what they are objectively authorized to do. *United States v. Bams*, 858 F.3d 937 (5th Cir. 2017).

---

as there is "some degree of communication" between the acting officer and the officer who has knowledge of the necessary facts. *United States v. Ibarra*, 493 F.3d 526, 530 (5th Cir. 2007).

Additionally, probable cause to search an automobile exists where "trustworthy facts and circumstances within the officer's personal knowledge would cause a reasonably prudent man to believe that the vehicle contains contraband." *Id.* The probable cause determination is also drawn from the circumstances. *Id.*

The evidence shows that officers were surveilling Johnson and Dowden and had reasonable suspicion to believe that the vehicle would contain contraband. The stop was lawful even if Trooper Dranguet's subjective reason for the stop was to look for contraband. The evidence shows that a reliable CI provided information that Johnson had obtained six kilos of methamphetamine and that Johnson and another subject brought methamphetamine to a subject that was arrested by RPSO and was found in possession of four ounces of methamphetamine. Information of criminal activity given by a known reliable informant is enough to sustain a *Terry* stop. *See Alabama v. White,* 496 U.S. 325, 328 (1990) (construing the holding of *Adams v. Williams,* 407 U.S. 143 (1972)).

The second prong of *Terry* requires an analysis of whether the search or seizure was reasonably related in scope to the circumstances that justified the stop in the first place. *Flores-Majarez,* 421 Fed.Appx. at 409 (citing *Lopez-Moreno,* 420 F.3d at 430). However, Johnson did not raise this issue. Thus, it is unnecessary for the court to address it.

### D.    <u>Evidence was lawfully obtained through execution of the first search warrant.</u>

Johnson argues that the first warrant was based on hearsay of a CI whose reliability was not established. ECF Nos. 131 at 3, 214-1 at 3. Johnson further argues

that officers used the unlawful traffic stop and erroneous allegations to obtain the first warrant.  ECF No. 214-1 at 3.

Specifically, Johnson argues that the first warrant application submitted by Captain Taitano was submitted after the traffic stops of Johnson and Dowden.  ECF No. 214-1 at 4.  Johnson asserts Captain Taitano's application may be broken into four areas:

> (1) Paragraphs 1-3 of warrant application 1. Confidential informant 1 ("C1") contacted law enforcement with information related to a white male possessing approximately six kilos of methamphetamine.  He then allegedly picked Defendant out of a lineup and gave various other details including a telephone number for an "AJ." Finally, C1 indicated that drugs would be found behind the house of Ashley Dowden who lived on 8-mile loop.
> (2) Paragraphs 4 and 5 of warrant application 1. Confidential informant 32 ("C2") was arrested for felony drug possession by law enforcement on March 3, 2020. Following the arrest, C2 stated that he knew of an "AJ" that possessed large amounts of methamphetamine and provided a telephone number for "AJ."  C2 also stated that drugs could be found behind a residence on 8-mile loop. No information was asserted as to the informant creditability or reliability of this informant in the affidavit.
> (3) Paragraphs 6-8 of warrant application 1.  The affiant provides information related to an unrelated investigation of property being taken out of a wrecked vehicle at an impound yard and asserts that Defendant is a suspect.  The affiant then tries to unsuccessfully arrange a drug delivery from an unknown subject using the telephone number provided by C1 and C2.
> (4) Paragraphs 9-12 of warrant application 1.  The affiant declares that a traffic stop was conducted on Defendant for driving under suspension. The affiant then admits no contraband was found in Defendant's possession.  The affiant declares that a traffic stop was conducted on Ashley Dowden wherein contraband was found, and an arrest was made.

ECF No. 214-1 at 5.

Johnson argues that the information was then used to obtain a search warrant on 403 Jefferson Street.  *Id.*  He contends the application is devoid of any indication

that contraband is located at that address. *Id.* Johnson also contends that neither of the CIs indicated that illegal substances would be located there. *Id.* Johnson argues that no illegal activity was observed at that address. *Id.* And he contends that neither Johnson nor Dowden indicated that any contraband would be located there. *Id.*

Johnson asserts that the reliability or credibility of C2 was not established. *Id.* He asserts that the C2's arrest for felony drug possession undermines his credibility and that his statements should not have been considered a justification for the search warrant. *Id.* at 5-6.

Johnson also argues that information asserted regarding his involvement in taking items out of a wrecked vehicle should have been disregarded. *Id.* at 6. He asserts the information includes erroneous accusations. *Id.* Johnson argues the accusations had nothing to do with possessing contraband. *Id.* Thus, Johnson contends the first warrant should not have been issued. *Id.* Johnson claims that the Government should not be allowed to prevail on a "good-faith reliance" on the warrants. *Id.*

The Government argues that the law enforcement evidence revealed Johnson's and Dowden's arrival to his home and then their separate departure in each other's vehicles. ECF No. 242 at 8. The Government argues that given the discovery of methamphetamine in Johnson's truck, the K-9 alert on Dowden's car that Johnson was driving, along with the recent arrest for possession with intent to distribute methamphetamine in January of 2020 plus recent, post-January 2020 intel to law

enforcement that Johnson was dealing in methamphetamine near his house, the totality of the facts and circumstances known to law enforcement contained probable cause sufficient to authorize a search of Johnson's residence.  *Id.*

Where the evidence to be suppressed was obtained with a warrant, courts generally determine first whether the good-faith exception applies.  *See, e.g., United States v. Sibley*, 448 F.3d 754, 757 (5th Cir. 2006); *Payne*, 341 F.3d at 399.  If the exception applies, then courts typically deny the motion without deciding whether the warrant was based on probable cause. *United States v. Gates*, 2021 WL 3022037, at *2 (E.D. Tex. Jul. 16, 2021) (citing *United States v. Cherna*, 184 F.3d 403, 407 (5th Cir. 1999)) (If the good-faith exception applies, courts do not need to decide "whether there was a substantial basis for the magistrate's determination that probable cause existed."); *United States v. Maggitt*, 778 F.2d 1029, 1033 (5th Cir. 1985) (quoting *Illinois v. Gates*, 462 U.S. 213, 264 (1983) (White, J., concurring)).

Here, the court need not reach the second step because the good-faith exception applies.  Under the good-faith exception, evidence obtained during the execution of a warrant later determined to be deficient is admissible nonetheless, so long as the executing officers' reliance on the warrant was objectively reasonable and in good faith.  *Payne*, 341 F.3d at 399 (citing *Leon,* 468 U.S. at 921–25).  "[T]he officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable, and it is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued."  *Id.*

Further, in determining whether the *Leon* good faith exception applies, a court may consider not only the four corners of the affidavit, but also "the circumstances surrounding issuance of the warrant." *Payne*, 341 F.3d at 402. Particularly where, as here, the warrant was issued by a state judge, "the federal 'four corners rule' requiring that either the affidavit or recorded oral testimony alone establish probable cause does not apply." *See United States v. Triplett*, 684 F.3d 500, 506 n.3 (5th Cir. 2012) (finding that "four corners rule" did not apply because a state judge issued the warrant).

Thus, the reviewing court should defer to an issuing judge's probable cause determination in signing a warrant unless they identify one of four following situations in which the good faith exception does not apply:

(1) when the issuing magistrate was misled by information in an affidavit that the affiant knew or reasonably should have known was false;

(2) when the issuing magistrate wholly abandoned his judicial role;

(3) when the warrant affidavit is so lacking in indicia of probable cause as to render official belief in its existence unreasonable;

(4) when the warrant is so facially deficient in failing to particularize the place to be searched or the things to be seized that executing officers cannot reasonably presume it to be valid.

*United States v. Contreras*, 905 F.3d 853, 857 (5th Cir. 2018) (quoting *United States v. Woerner*, 709 F.3d 527, 533–34 (5th Cir. 2013).

Here, the Court finds no circumstances present that would bar application of the good faith exception. Johnson recites some of the *Leon* factors in his supplemental motion. Johnson generally asserts that the affidavit contains "erroneous information," but does asserts how the information is erroneous and no facts establish that officers were aware of any erroneous information in the affidavit. Rather, he alleges that allegations concerning his involvement as a suspect in removing items from the wrecker yard are unsupported. No evidence was presented to support Johnson's allegations that erroneous information was set forth in the affidavit.

Johnson also never argues that the affidavit was a "bare bones" affidavit such that officers could not have reasonably relied on the resulting warrant. Valid warrants are often contrasted to those supported by mere "bare bones" affidavits, which "contain wholly conclusory statements, [and] lack the facts and circumstances from which a magistrate can independently determine probable cause." *United States v. Massi*, 761 F.3d 512, 530 (5th Cir. 2014) (citing *United States v. Satterwhite*, 980 F.2d 317, 321 (5th Cir. 1992)). "When a warrant is supported by more than a 'bare bones' affidavit, officers may rely in good faith on the warrant's validity." *Id.*

Because the affidavit was not "so lacking in indicia of probable cause as to render belief in its existence entirely unreasonable," the good faith exception applies. *See Contreras*, 905 F.3d at 857. The officers reasonably relied in good faith on the warrant to authorize the search of the residence.

Captain Taitano attested in the first search warrant that the NPSO had good reason to believe that 403 Jefferson Street, Unit B, concealed "illegal narcotics mainly

methamphetamine, drug paraphernalia, stolen weapons, stolen items, and any other items deemed pertinent to this ongoing narcotics investigation."  ECF No. 133-1 at 1. Captain Taitano's application attested that between February 29, 2020 and March 3, 2020, Detective Craig Lacour with NPSO Criminal Investigation Division contacted him regarding a CI who had information that a white male had approximately six kilos of methamphetamine.  *Id.* at 5.  Captain Taitano attested that the CI had been deemed reliable to Natchitoches Multi-Jurisdictional Drug Task Force ("NMJDTF") and NPSO Criminal Investigations Division ("CID") due to the informant providing information that has led to the arrest of a narcotics dealer and the seizure of several pounds of marijuana.  *Id.*  He further attested that the CI had also previously provided information to NPSO CID which led to the arrests of several suspects relating to burglaries and thefts.  *Id.*

Captain Taitano attested that between February 29 and March 3, 2020, the CI met with NMJDTF agents and he:  (1) picked Johnson ("AJ") out of a line up; (2) provided information that Johnson went to Texas and picked up a large amount of methamphetamine and brought it back to Natchitoches within the last two days; (3) advised that Johnson had in his possession at least six kilos of methamphetamine; (4) advised the NMJDTF agents conducted a search warrant at Johnson's residence on Jefferson Street where he had narcotics hidden in a spot in the ceiling in a closet (NMJDTF did conduct a search warrant of the residence in the past); (5) advised that Johnson and another subject went to Alexandria to bring methamphetamine to a subject named "slim" and that the subject that was arrested by RPSO goes by the

name slim and was found in possession of four ounces of methamphetamine upon his arrest; (6) provided a cell phone number for "AJ"; and (7) advised that "AJ"'s girlfriend is Dowden and lives off eight-mile loop and that narcotics are kept behind the house in a shed.  ECF No. 133-1 at 5.

Captain Taitano further attested that on March 3, 2020, he was contacted by Lt. Beebe with RPSO who advised that he had a male subject in custody for possession of over four ounces of methamphetamine.  *Id.* at 6.  Lt. Beebe advised that the suspect provided information about a while male subject by the name "AJ" who drove a jacked up Nissan pickup truck who was in possession of six kilos of methamphetamine.  *Id.* The suspect had messages on his cell phone from "AJ" from 218-228-0234 showing the suspect ordering large amounts of narcotics from "AJ."  *Id.*  The suspect also advised that "AJ" had a subject deliver a kilo of methamphetamine to the suspect that morning.  *Id.*  The suspect also showed RPSO officers "AJ's" Facebook page which is the same individual picked out of the line up by the reliable informant.  *Id.*  The subject also mentioned the residence on eight-mile loop where "AJ's" girlfriend lives where illegal narcotics may be found.  *Id.*

Captain Taitano further attested that Johnson was recently arrested in January of 2020 for possession of methamphetamine and it had not been adjudicated. *Id.*  He attested Johnson was also a suspect in removing illegal narcotics from a vehicle that was impounded at a wrecker yard.  *Id.*  He stated that agents corroborated that "AJ" Adam Johnson lives at 403 Jefferson Street, Natchitoches and that he owns and operates a red Nissan Titan.  *Id.*  Captain Taitano attested that the

arrested subject under the supervision of RPSO narcotics agents attempted to get "AJ" to bring two kilos of methamphetamine to Alexandria, but Johnson stated he heard the subject was arrested and then hung up. *Id.* At the same time, NMJDTF agents were conducting live surveillance on Johnson at his Jefferson Street residence. *Id.*

Captain Taitano attested that agents observed Dowden arrive at the residence in a silver Mazda vehicle and enter the residence. *Id.* Five minutes later, she exited the residence and left in Johnson's Nissan. *Id.* Soon after, Johnson exited his residence in Dowden's silver Mazda car. *Id.* Captain Taitano attested that agents stopped the Mazda operated by Johnson for driving under suspension. *Id.* During the stop, a K-9 alerted on the vehicle for positive narcotics odor. *Id.* Captain Taitano attested that no illegal narcotics were found but the K-9 alert raised suspicions that illegal narcotics were once inside the vehicle. *Id.* He stated that Johnson was arrested for driving under suspicion along with being a subject of an ongoing narcotics investigation. *Id.*

Captain Taitano attested that agents simultaneously conducted surveillance of the Nissan Titan driven by Johnson's girlfriend Dowden and that she was stopped by NMJDTF agents. *Id.* He stated that a narcotics K-9 gave a positive odor response on the vehicle. *Id.* Agents did not locate any illegal narcotics, but found a stolen firearm and drug paraphernalia. *Id.* Agents also located in Dowden's purse a journal which Captain Taitano attested was a drug journal of people who owed money with listed amounts. *Id.* Agents also located another narcotics journal in the middle

console. *Id.* Dowden stated she had no knowledge of the journals. *Id.* Captain Taitano requested a search of 403-B Jefferson Street where Johnson resides based on the information that illegal narcotics and other stolen weapons were being stored at Johnson's residence. *Id.*

Considering the four corners of the affidavit and the totality of the circumstances surrounding the issuance of the warrant, the Court concludes it was reasonable for officers to rely on the warrant and infer that narcotics may be located inside the 403-B Jefferson Street residence. *See, e.g., United States v. Sauls*, 192 Fed.Appx. 298, 300 (5th Cir. 2006) ("[The defendant's] arrest three months earlier in the same car that was registered to a resident at [the residence] was sufficient to connect him to that residence," and "[the defendant's] prior arrests on narcotics violations and the evidence discovered in the curbside garbage were sufficient to support a reasonable belief that contraband would be found inside the residence."). Thus, the undersigned finds that the good faith exception applies.

### E.     Reliability of hearsay relied on in the first warrant was established.

Johnson argues that the first search warrant relied on dubious hearsay testimony of CI-1. ECF No. 131-1 at 2. Johnson further argues that the inclusion of "CI-2" (Sandifer) was deficient because it did not include any indication of his reliability or credibility. ECF No. 214-1 at 5. He states it was only known that he was under arrest for felony drug possession, which cuts against his credibility. *Id.*

"When a warrant is supported by more than a 'bare bones' affidavit, officers may rely in good faith on the warrant's validity." *United States v. Massi*, 761 F.3d

512, 530 (5th Cir. 2014). "An affidavit may rely on hearsay – information not within the personal knowledge of the affiant, such as an informant's report – as long as the affidavit presents a 'substantial basis for crediting the hearsay.'" *United States v. Satterwhite*, 980 F.2d 317, 321 (5th Cir. 1992). In determining the reliability of a CI, a court must consider the totality of circumstances, including the informant's veracity, credibility, and basis of knowledge. *Illinois v. Gates*, 462 U.S. 213, 230 (1983).

A court is to apply a two-prong test of veracity and basis of knowledge. *Id.* "[A] deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *United States v. Laury*, 985 F.2d 1293, 1312 (5th Cir. 1993) (citing *Gates*, 462 U.S. at 230-33). "The veracity of an informant is often assessed from the accuracy of previous tips." *Laury*, 985 F.2d at 1312. "An informant's basis of knowledge can . . . be established by a particularly detailed tip." *Id.* at 1313 (citing *United States v. Jackson*, 818 F.2d 345, 349 (5th Cir. 1987)). Corroboration by the investigating officers may also support the informant's reliability. *See Gates*, 462 U.S. at 244-45 ("'corroboration through other sources of information reduced the chances of a reckless or prevaricating tale,' thus providing 'a substantial basis for crediting the hearsay'").

The law of this circuit is that there is no set requirement that all tips be corroborated by subsequent police investigation to be considered credible. Rather, whether subsequent corroboration is necessary must be determined in the light of the

totality of the circumstances presented by the particular set of facts. *United States v. Rojas Alvarez*, 451 F.3d 320, 332–33 (5th Cir. 2006) (internal citations and quotations omitted). A tipster's information which corroborates "prior information and continuing suspicions of authorities," as opposed to the case in which the tip was the first piece of information leading to the suspect, need not necessarily be corroborated by subsequent investigation. *Id.* Importantly, the court should not judge the "bits and pieces of information in isolation." *Massachusetts v. Upton*, 466 U.S. 727, 732 (1984). Where "no single piece of evidence is conclusive[,b]ut the pieces fit neatly together," a court should find the issuing court was justified in its determination "that there was 'a fair probability that contraband or evidence of a crime' would be found." *Id.*

As discussed above, Captain Taitano attested that the CI had been deemed reliable due to the previously providing information leading to the arrest of a narcotics dealer and seizure of several pounds of marijuana. He also attested that CI-1 provided information which led to the arrests of several suspects for burglaries and thefts. CI-1's information was corroborated by the RPSO arrestee, and Captain Taitano attested that CI-1 and CI-2 were unknown to each other. The affidavit here was far from "bare bones." The affidavit sufficiently establishes the veracity and accuracy of CI-1's and CI-2's information which was corroborated by prior information and continuing suspicion of authorities.

**F.**   **Johnson lacks standing to challenge the voluntariness of Dowden's statements.**

Johnson argues that the circumstances in which Dowden made her statements calls into question the voluntariness of her statements.  ECF No. 214-1 at 7.  Johnson argues that Dowden's statements were made under custodial interrogation.  *Id.* at 7-8.  He further asserts that Dowden refused to answer questions the first time police attempted to interrogate her.  Johnson argues that the second interrogation occurred within hours of the first and deserves scrutiny.  *Id.* at 8.

Johnson asserts that two officers conducted the interview while Dowden was in handcuffs in an interrogation room, without counsel present.  *Id.*  Officers were aware that Dowden did not live at the address but stayed there occasionally.  *Id.*  Yet, Johnson contends, Dowden was told she would be charged with all of the contraband found at 403 Jefferson Street if she did not cooperate or provide a statement.  Johnson argues this threat amounts to coercion.  *Id.*  Johnson argues that Dowden's coerced statement, including the evidence gathered in the traffic stop and the first search of the premises, was the basis for the issuance of the second search warrant.  *Id.* at 9.  Johnson contends that the second warrant should not have been issued as it was based on the unlawful traffic stop, a problematic first warrant, and the coerced confession of Dowden.  *Id.*

Johnson cites no legal authority other than general *Miranda* law supporting his challenge to Dowden's statements to officers during custodial interrogation.  To have standing to raise a Fourth Amendment challenge, a defendant's expectation of privacy must be "personal and reasonable" and it must have "a source outside the

27

Fourth Amendment, either by reference to the concepts of real or personal property or to understandings that are recognized and permitted by society." *United States v. Hernandez*, 647 F.3d 216, 220 (5th Cir. 2011) (quoting *Minnesota v. Olson*, 495 U.S. 91 (1990)).   A defendant has standing to challenge the admission of evidence only if his own constitutional rights have been violated.  *See United States v. Salvucci,* 448 U.S. 83, 86–87 (1980) *Rakas v. Illinois,* 439 U.S. 128, 133-34 (1978) ("The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated."); *see also United States v. Fredericks,* 586 F.2d 470, 480 (5th Cir. 1978) (a co-defendant may not seek "to suppress evidence incriminating him that was obtained from a coparticipant in crime without proper compliance with the procedural requirements of *Miranda* or otherwise in violation of that party's Fifth or Sixth Amendment rights")

Here, Johnson lacks standing to challenge the voluntariness of co-defendant Dowden's statements.   Thus, Johnson cannot rely on the alleged denial of the constitutional rights of Dowden to suppress the second search warrant.

### G.   Evidence gathered from the search of Johnson's cell phone and Facebook was lawfully obtained.

Johnson seeks suppression of evidence gathered as a result of the warrant to search his cell phone and Facebook account on the basis that the cell phone was seized as a result of an unlawful traffic stop.  ECF No. 214 at 5.  He contends his cell phone and Facebook account are fruit of the poisonous tree, but otherwise offers no additional authority for his argument.

Johnson does not reference the subsequent cell phone and Facebook search warrants. The Court presumes Johnson seeks to challenge the subsequent search warrants solely on the basis that that underlying traffic stop and warrants were unlawful or deficient. No additional argument or evidence was raised as to the subsequent cell phone and Facebook search warrants, and they were not introduced into evidence.

As discussed herein, the underlying traffic stop and residential search warrants were lawful. The Fourth Amendment is silent as to the remedy for an unlawful search or seizure but the jurisprudentially created "exclusionary rule prohibits the introduction at trial of all evidence that is derivative of an illegal search, or evidence known as the 'fruit of the poisonous tree.'" *United States v. Singh*, 261 F.3d 530, 535 (5th Cir. 2001) (citing *United States v. Grosenheider*, 200 F.3d 321, 327 (5th Cir. 2000)). The Fifth Circuit has held that "if law enforcement officials act in objectively reasonable good-faith reliance upon a search warrant, then evidence obtained pursuant to the warrant is admissible even if the affidavit on which the warrant was grounded was insufficient to establish probable cause." *Juarez*, 407 Fed.Appx. at 825. Moreover, under the good faith exception, if an officer's "reliance on the magistrate's probable cause determination and on the technical sufficiency of the warrant he issues [is] objectively reasonable," a court need not suppress the fruits of the search. *United States v. Flanders*, 468 F.3d 269, 271 n.2 (5th Cir. 2006) (quoting *Leon*, 468 U.S. at 922).

Additionally, warrantless searches and seizures may be constitutional when performed incident to a lawful arrest. *See Riley v. California*, 573 U.S. 373, 382-85 (2014).

For the reasons already stated above, the traffic stop of Johnson was not an unlawful stop or seizure as the officers had probable cause to believe that Johnson was driving under suspension and for which he was placed under arrest. The warrantless seizure of Johnson's cell phone falls under the exception to the warrant requirement where it was seized incident to his arrest. And the officers relied in good faith on the search warrant. Thus, Johnson's "fruit of the poisonous tree" argument is without merit.

### H.  Electronic signatures for electronic warrants have the full effect of law.

Johnson contends that the search warrants were either not signed, were signed electronically, or signed with a stamp of some sort. Johnson asserts the first search warrant lacks an original signature.

Electronic search warrants have become commonplace. *See Riley v. California*, 573 U.S. 373, 401 (2014) ("Recent technological advances . . .have . . . made the process of obtaining a warrant itself more efficient."); *Missouri v. McNeely*, 569 U.S. 141, 154 (2013) (plurality op.) ("Well over a majority of States allow police officers or prosecutors to apply for search warrants remotely through various means, including telephonic or radio communication, electronic communication such as e-mail, and video conferencing.").

Effective August 1, 2012, the Louisiana Legislature enacted La. Code Crim. P. art. 162.2, which provides for the issuance of a search warrant by electronic testimony. Article 162.2 provides that the applicant is responsible for "creat[ing] a written reproduction of his electronic testimony, including its electronic signature, and a written production of the warrant, *including the judge's electronic signature*, and preserv[ing] the written reproductions in the same manner as an original warrant signed by both the applicant and the judge[.]" La. Code Crim. P. art. 162.2(F) (emphasis added). Moreover, "[t]elephonic communication between the judge and the affiant relatively contemporaneously with the application for the warrant" satisfies the requirements for electronic applications under La. R.S. 9:2603.1. La. Code Crim. P. art. 162.2(G). Under the Louisiana Uniform Electronic Transaction Act, "[a]ny such application, signature, or record in electronic form shall have the full effect of law." La. R.S. 9:2603.1(A).

Here, the warrants were obtained through an application called WarrantNow. ECF No. 181 at 16, 30. The Government provided the testimony of Captain Taitano who provided an overview of the process. The electronic warrants are sent digitally to the district judge, where she reviews them and digitally signs them. Once signed, agents print them off and then issue a return after they conclude their search. Both warrants on 403-B Jefferson Street in Natchitoches were electronically signed by the state district judge, Judge Sylvester. Captain Taitano spoke with Judge Sylvester before he submitted the digital application for a warrant. The first warrant was at approximately 12:30 a.m. and the second warrant was at around 4:00 a.m. The

Government provided copies of the first and second search warrants which reflect the digital signature of Judge Sylvester. ECF Nos. 133-1, 133-2. No evidence establishes that the search warrants failed to comply with state law.

Nonetheless, Johnson's argument is without merit. The United States Court of Appeals for the Fifth Circuit has rejected a similar argument, stating "[t]he question that a federal court must ask when evidence secured by state officials is to be used as evidence against a defendant accused of a federal offense is whether the actions of the state officials in securing the evidence violated the Fourth Amendment to the United States Constitution." *United States v. Powell*, 850 Fed.Appx. 284, 286 (5th Cir. 2021) (quoting *United States v. Walker*, 960 F.2d 409, 415 (5th Cir. 1992)).

Here, Johnson provides no argument that Louisiana's electronic warrant law violates the Fourth Amendment. Thus, Johnson's claim that the search warrants were unsigned is without merit.

## III.  Conclusion

Because the traffic stop was lawful at its inception and was supported by probable cause that Johnson committed a traffic violation; because the executing officers acted in objectively good faith in relying upon the warrants; and because Johnson lacks standing to challenge Dowden's statements;

IT IS RECOMMENDED that Johnson's Motions to Suppress (ECF Nos. 131, 214) should be DENIED.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), any party may serve and file with the Clerk of Court written objections to this Report and

Recommendation within fourteen (14) days after being served with a copy thereof, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. No other briefs (such as supplemental objections or reply briefs) may be filed, unless a party shows good cause and obtains leave of court. The District Judge will consider timely objections before issuing a final ruling.

A party's failure to file written objections to the proposed factual findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days after being served with a copy thereof, or within any extension of time granted by the Court under Fed. R. Civ. P. 6(b), shall bar that party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in Alexandria, Louisiana, on this 22nd day of February 2023.

JOSEPH H.L. PEREZ-MONTES
UNITED STATES MAGISTRATE JUDGE